# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**HAROLD ABRAHAMSON**
**JONATHAN E. HALM**
Abrahamson, Reed & Bilse
Hammond, Indiana

**BRIAN CUSTY**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**KARL L. MULVANEY**
**NANA QUAY-SMITH**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

**F. JOSEPH JASKOWIAK**
**LAUREN K. ROEGER**
**KEVIN G. L. KERR**
Hoeppner, Wagner & Evans
Valparaiso, Indiana

**NATALIE VANGEL SHRADER**
Burke, Costanza & Carberry LLP
Merrillville, Indiana

FILED

Apr 05 2012, 8:57 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

JAMES GAGAN, FRED WITTLINGER, )
JACK ALLEN and EUGENE DEUTSCH, )
)
    Appellants-Plaintiffs, )
)
        vs. )    No.  45A05-1107-CT-377
)
C. JOSEPH YAST, )
)
    Appellee-Defendant. )

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Nanette K. Raduenz, Special Judge
Cause No. 45D03-0905-CT-7

**April 5, 2012**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

Today we decide that the appellee-defendant attorney's alleged defamatory statements that he made against his former clients, the appellants-plaintiffs, were protected on the grounds of qualified privilege.

Appellants-plaintiffs James Gagan, Fred Wittlinger, Jack Allen, and Eugene Deutsch (collectively, Gagan) appeal the trial court's grant of summary judgment in favor of appellee-defendant C. Joseph Yast, on their claim against Yast for defamation. Specifically, Gagan argues that the trial court erred in determining, as a matter of law, that the alleged defamatory statements that Yast made were protected on the grounds of qualified privilege. Gagan maintains that the doctrine of privilege does not apply in these circumstances and, therefore, a genuine issue of material fact remains and the matter should be remanded for trial. Concluding that the trial court properly granted Yast's motion for summary judgment, we affirm.

## FACTS

Gagan founded United Consumers Club (Consumers Club), the parent company for DirectBuy, Inc. (DirectBuy), in 1971. DirectBuy ultimately became a very successful

2

multi-million dollar franchising business.[1]  Gagan's efforts to develop DirectBuy were aided by Deutsch, Wittlinger and Allen, who were long-time business associates of his. Wittlinger joined the company in 1973, and Deutsch, who initially served as DirectBuy's accountant, joined the company in 1993.  Allen became associated with the company in 1974.

Deutsch, Wittlinger, and Allen became minority shareholders in DirectBuy, while Gagan remained the primary shareholder.  When the company was sold in 2007, Deutsch was an officer of the corporation, and all four served as directors.

Jamie is Gagan's adult son and the owner of ThinkTank Software Development Company (ThinkTank).  Although Gagan urged Jamie to join DirectBuy, Jamie declined because he had some conflicts with his father, whom he described as "a strong individual" with a "temper."  Appellants' App. p. 339, 349, 352.  Jamie founded ThinkTank and became the sole owner of the company.

Yast is an attorney and was close friends with the Gagan family for nearly thirty years.  Yast represented the Gagans and their various businesses in numerous lawsuits during a twenty-year period.  Sometime in 2006, Gagan offered Yast a position as DirectBuy's vice president and general counsel, and Yast accepted the position.  Yast's employment contract permitted—but did not require—that he work on some additional

---

[1] DirectBuy is a franchisor of membership-based buying centers in over 100 locations across the United States and Canada.  DirectBuy's members pay a fee to belong to the club, and have the ability to purchase a broad selection of merchandise from manufacturers at wholesale prices.

projects. However, Deutsch told Yast that he should continue to represent ThinkTank in various litigation matters.

When Gagan was negotiating the sale of DirectBuy, he insisted that Yast still represent ThinkTank while serving as general counsel for the new company. There is no dispute that Gagan and Deutsch participated in litigation involving ThinkTank, that Yast reported to Gagan and Deutsch, and that Gagan retained Yast and was paying his attorney's fees.

On November 30, 2007, Gagan, Deutsch, Allen and Wittlinger sold all of their interest in DirectBuy to Trivest, a holding company, for $550 million. At the time of the sale, Yast was DirectBuy's vice president and general counsel, but not a shareholder. Yast was not involved in the merger negotiations because Gagan was represented by legal counsel from Chicago. The merger agreement specifically permitted Yast to continue representing ThinkTank. Gagan also insisted that DirectBuy's officers should be permitted to invest in the company by purchasing stock after the sale. Gagan advised Yast to invest in the new company. Yast followed that advice and purchased $500,000 in DirectBuy stock. Other officers, including Scott Powell, DirectBuy's president, and Bart Fesperman, an executive officer, also purchased stock in DirectBuy.

The merger agreement also provided that Gagan and the other sellers, in addition to receiving the purchase price of $550 million, were also entitled to receive all "excess cash" in the company. Appellants' App. p. 266, 270, 717. After the agreement was signed, but before closing, Gagan and the other sellers declared a "dividend" to

4

themselves of approximately $75 million, based on Deutsch's calculation of "estimated excess cash." Id. at 209-10.

Gagan admitted that $17 million of this dividend did not constitute company earnings or retained profits. Rather, these funds were member merchandise money that DirectBuy was holding as a "purchasing agent." Id. at 181-82, 210-16. While Gagan and the other sellers acknowledged that they were not entitled to this money when it was entered on DirectBuy's books as a "member merchandise deposit," they nonetheless claimed that the $17 million constituted "excess cash" under the merger agreement because an accounting journal entry designated this money as an "accounts payable" once the merchandise shipped and DirectBuy received the manufacturer's invoice.

After closing the deal, Trivest determined that Gagan had taken $17 million in member merchandise money that had been held in accounts payable to pay for merchandise. As a result, Trivest disputed Gagan's right to take this money as "excess cash" under the merger agreement and sought unsuccessfully to resolve the issue with Gagan and the other sellers.

After learning that Gagan and the others had taken $17 million of member merchandise money as a dividend and that Trivest was challenging that withdrawal under the merger agreement, Yast, Powell, and Fesperman, who were DirectBuy's three highest-ranking officers, decided to contact Gagan and explain their concerns. Yast and the other officers did not base their concerns on the terms of the merger agreement. Rather, they believed that Gagan's withdrawal of the money was inconsistent with

5

DirectBuy's core values and would destroy their personal relationships. Thus, Powell, Yast, and Fesperman each sent letters to Gagan and the other sellers in an effort to open a dialogue about the issue.

Their letters dated March 20, 2008, expressed the officers' disappointment with Gagan's decision to withdraw the money in light of the company's longstanding practice of treating member merchandise money as "sacred." Appellants' App. p. 878-85. The letters challenged Gagan's contention that accounting entries which moved members' merchandise deposits from one liability account to another made those funds available for shareholder distribution. The officers' position was based on two grounds:

> The Sellers' actions would never be accepted if a franchisee attempted it. Once a franchisee accepted member merchandise money, those funds could only be used by DirectBuy to pay the supplier for the product or to refund the member.

> These funds were not longer available to use for their intended purpose, which was to pay for the members' merchandise.

Appellants' App. p. 878-85.

These letters pointed out that twenty-six current employees had invested in the company, and that DirectBuy, through its investors, would have to repay the missing merchandise deposits. The letters also advised Gagan and the other sellers to reconsider their decision because it would damage the long-standing relationships between them and the officers. However, Gagan and the other sellers did not respond.

On April 18, 2008, members of Trivest and Gagan and the other sellers met in a final attempt to resolve the matter. The meeting was unsuccessful and the matter

6

proceeded to arbitration on June 11, 2008. In August 2008, the arbitrator ordered the sellers to repay $5 million of the dividends, but approved the withdrawal of $17 million in member merchandise money on the basis that funds designated as "accounts payable" satisfied the agreement's definition of "excess cash." Appellants' App. p. 226, 270, 877.

In light of the ongoing dispute, Yast determined that he had a conflict of interest in continuing to represent Gagan in a federal court judgment collection action. Yast recognized that as an officer and shareholder of DirectBuy, his personal and professional interests in recovering the $17 million conflicted with Gagan's interests in retaining this money. Moreover, Yast believed that this dispute was not likely to be resolved without arbitration. As a result, Yast decided that he had a duty to inform Gagan of the effect of this dispute on their attorney-client relationship.

On April 16, 2008, Yast sent a letter to Gagan and enclosed a consent form to withdraw from the federal litigation. Yast advised Gagan that his position on the $17 million withdrawal of member merchandise money constituted a conflict of interest. Yast reasoned that his investment in DirectBuy was seriously harmed and that two or three years of company growth would be diminished. Yast's letter also informed Gagan that there would be a similar conflict of interest in representing ThinkTank if the dispute continued.

When Trivest and Gagan and the other sellers were unable to reach an agreement at their final meeting on April 18, 2008, Yast withdrew his appearance for Gagan in the federal litigation. Yast also determined that his conflict with Gagan created a conflict of

interest in continuing to represent ThinkTank. Yast based his conclusion on the fact that Gagan and Deutsch were directly involved with the litigation in federal court, that Gagan directed and controlled that litigation, that Yast reported to Gagan as a client representative for ThinkTank, and that Gagan paid his fees. As a result, Yast determined that he had a duty to inform Jamie that he should withdraw from the ThinkTank litigation.

On April 23, 2008, Yast informed Jamie that he had a conflict of interest and the Rules of Professional Conduct required him to withdraw as ThinkTank's legal counsel. Although Yast and Jamie agreed that the only subject discussed during the call involved Yast's conflict of interest and his intention to withdraw, Yast also claimed that he told Jamie that he should withdraw from representing ThinkTank because Gagan's decision to keep the $17 million in membership merchandise money was causing financial harm to Yast. Yast explained that he had a substantial investment in DirectBuy and that Gagan's decision eliminated almost three years of the company's growth.

Thereafter, the sellers described this conversation as a threat by Yast to withdraw as a device to use Jamie as leverage in Yast's dispute with Gagan. However, Yast claimed that his purpose in calling was only to inform Jamie that his conflict of interest would prevent him from continuing to represent ThinkTank.

On August 1, 2008, and again on August 20, 2008, attorneys from Mayer Brown notified Yast that they were representing the Gagan family in their various business interests, including the ThinkTank litigation. Yast subsequently sent Jamie a written ten-

8

day notice of his intent to withdraw from ThinkTank's representation in accordance with the Porter Superior Court Local Rules. Yast then filed a motion to withdraw as counsel for ThinkTank on October 17, 2008, which advised the court of the same conflict of interest that Yast described in his telephone call with Jamie. The trial court subsequently granted Yast's motion to withdraw.

On December 10, 2008, Gagan filed suit against Yast for uttering "a series of false and defamatory statements regarding [Gagan]." Appellants' App. p. 38. Gagan asserted that Yast had falsely accused Gagan and "his accomplices" of stealing "millions of dollars from the DirectBuy members." Id. Yast was also accused of referring to Gagan as a "liar," a "manipulator," and an "evil person." Id. The sellers also contend that Yast demonstrated malice by allegedly referring to Gagan as a manipulator during a casual discussion with Jamie's wife.

Two days later, Jamie filed a disciplinary grievance against Yast, challenging the manner in which Yast withdrew his representation. Jamie argued that Yast's disclosure of his conflict of interest in their telephone call on April 23, 2008, was inappropriate because Yast's purpose was to leverage his withdrawal to force Gagan to capitulate in his dispute with Trivest. Jamie also alleged that Yast's motion to withdraw contained false statements and revealed confidential information. Finally, Jamie alleged that Yast was angry about the effect that the sellers' actions had on his investment in DirectBuy and was using the dispute to manufacture a conflict with Think Tank. After receiving Yast's response to these allegations and the supporting documentation, the Disciplinary

Commission determined that Jamie's grievance did not raise a substantial question of misconduct and dismissed the matter on April 1, 2010.

Discovery in the case commenced, and the sellers took thirteen depositions, including former and current officers of DirectBuy, as well as its employees, and business manager. Counsel for the sellers asked each witness whether Yast had ever said anything derogatory about Jamie, Gagan or the other sellers, whether Yast had referred to them as thieves, whether Yast claimed that they stole money, causing a loss of his investment, or if they had committed a crime. Every witness testified that they had never heard Yast say any of those things, or anything derogatory about the sellers or the Gagans.

On April 11, 2011, Yast filed a motion for summary judgment seeking dismissal of Gagan's defamation per se claim on the grounds of absolute privilege, qualified privilege, and other defenses. More particularly, Yast alleged that the telephone call that was the subject of the defamation action was an attorney-client communication that was protected by absolute privilege that affords complete immunity. Yast also asserted that his alleged comments were protected by qualified privilege, and that Gagan's reputation was not affected. In fact, Yast pointed out that Gagan believed that the comments were "crazy" and he did not believe him, and that there was no damage to anyone's reputation. Appellants' App. p. 80.

Following a hearing, the trial court entered findings of fact and conclusions of law on June 22, 2011, denying Yast's motion for summary judgment on the grounds of

absolute privilege, but granting Yast's motion on the grounds of qualified privilege.  In

particular, the trial court determined:

> Taking into consideration the extent of Defendant's involvement with the entire Gagan family, his business relationship with the other Plaintiffs and his substantial financial interest in the Trivest matter, it was not unreasonable for Defendant to consider his financial stake in the Trivest matter a potential conflict of interest in any case involving the Gagan family.  The Court finds that Defendant had an ethical duty to notify his client of a potential conflict of interest and his concerns with his continued representation of that client in the future.  The qualified privilege would protect the communication even if the comments were false and defamatory.
>
> There was no evidence identified to suggest there was an excessive publication of the defamatory statements by the Defendant.  Further the evidence is undisputed that Defendant, even to this day, believes that the Plaintiffs were wrong in their characterization of the account in question.  Defendant's position regarding the legal entitlement of this account was ultimately determined to be incorrect.  Further, Plaintiffs may be correct that Defendant had no personal knowledge of the contract terms to form any such beliefs.  But in his capacity as attorney for UCC and DirectBuy Defendant had experienced the day-to-day operations of the business.  He was aware of the characterization and use of the account in question.  He was aware of how this particular account had been handled in the past. Defendant had some grounds for his belief.  Therefore, Plaintiffs evidence does not support a finding that Defendant's comments were made without belief or grounds for the belief in its truth.
>
> Plaintiffs contend Defendant's actions were motivated by ill will, thus there was an abuse of the privilege and he should be liable for the damages that resulted from his defamatory statements.  According to Plaintiffs, Defendant's motive was for his own financial gain.  They contend Defendant wrongfully wanted the seventeen million to stay with the new company so Defendant's stock would increase in value.  So his plan was to threaten to withdraw from Jamie's case in hopes that Jamie would convince his father and the other three Plaintiffs to give up on their claim to the seventeen million dollar account.  If Jamie refused, Defendant would withdraw from the case and Jamie would have to get a new attorney.  This could delay resolution of the ThinkTank case and possibly result in   a

11

negative outcome for Jamie Gagan. In Jamie's words, he, the Defendant, "was going to try to leverage my father's affection for me."

There is no direct evidence to support this supposition. Jamie never said that Defendant asked him to do anything. The worst case scenario, based on Jamie's recollection of the statements, was that Defendant told Jamie of the potential conflict based on his personal belief that the Plaintiffs were stealing money that belongs to the membership. As a direct result, Defendant's stock or interest in the new company would be diminished. If the matter was not resolved, Defendant felt he would have no choice but to withdraw from the ThinkTank case because of the conflict. Jamie's interpretation of the comments, and the Plaintiffs' suspicions of an ulterior motive are speculative at best. Taking into consideration the comments as recalled by Jamie Gagan, there is insufficient evidence to find that Defendant was motivated by ill will.

. . .

The Court finds that Plaintiffs have failed to designate sufficient material to establish that Defendant abused his qualified privilege. The comments made by Defendant to Jamie Gagan in April 2008, even if defamatory, are entitled to immunity under the qualified privilege. Judgment is entered in favor of . . . Yast and against . . . Gagan.

Appellants' App. p. 32-33 (emphasis added). Gagan now appeals.

DISCUSSION AND DECISION

Gagan argues that the trial court erred in granting Yast's motion for summary judgment because it erroneously made a factual determination that Yast's purportedly defamatory utterances were made in good faith. Gagan asserts that the designated evidence establishes that Yast's explanations for allegedly asserting false charges against Gagan were not made in good faith and, therefore, this matter should not have been resolved at the summary judgment stage. Gagan also asserts that genuine issues of material fact remained as to whether Yast's statements were "made with ill will or

12

improper purpose, as well as whether Yast's defamatory utterance was made without belief, or grounds for belief, in its truth." Appellant's Br. p. 1.

## I. Standard of Review

A party is entitled to summary judgment upon demonstrating the absence of any genuine issue of fact as to a determinative issue unless the non-moving party comes forward with contrary evidence showing an issue of fact for trial. Williams v. Tharp, 914 N.E.2d 756, 761–62 (Ind. 2009). An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Funston v. Sch. Town of Munster, 849 N.E.2d 595, 598 (Ind. 2006). The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of demonstrating that the trial court erred. Rosi v. Business Furniture Corp., 615 N.E.2d 431, 434 (Ind. 1993).

Where, as here, the trial court makes findings in rendering summary judgment, those findings aid in appellate review, but are not binding on this court. Althaus v. Evansville Courier Co., 615 N.E.2d 441, 444 (Ind. Ct. App. 1993). Thus, findings that accompany a grant of summary judgment do not alter the nature of our review. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). Rather, we will affirm a summary judgment

13

order if it is sustainable upon any theory or basis found in the record. <u>Savieo v. City of New Haven</u>, 824 N.E.2d 1272, 1274 (Ind. Ct. App. 2005).

## II. Gagans' Contentions

In addressing the issue as to whether the trial court erred in granting summary judgment for Yast, we note that the common interest qualified privilege "applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." <u>Schrader v. Eli Lilly & Co.</u>, 639 N.E.2d 258, 262 (Ind. 1994). Where there is no genuine issue of material fact regarding the nature of a lawyer's privileged communication with his client, this qualified privilege should be applied as a matter of law. <u>Conwell v. Beatty</u>, 667 N.E.2d 768, 779 (Ind. Ct. App. 1996).

Our Supreme Court recently affirmed a grant of summary judgment based on qualified privilege in <u>Dugan v. Mittal Steel USA Inc.</u>, 929 N.E.2d 184 (Ind. 2010). <u>Dugan</u> involved an employee's defamation claim against her employer and supervisor after the supervisor told other employees "that the plaintiff was stealing time. . . " in an "attempt to defraud the company," and had stolen an air compressor. <u>Id.</u> at 186. The trial court's grant of summary judgment for the employer and supervisor based on the common interest qualified privilege was affirmed because the intra-company communications were part of an internal investigation. <u>Id.</u> at 189.

14

This case involves a single, private, attorney-client communication which not only involved a common interest, but was a disclosure the lawyer had a duty to make under Indiana Rule of Professional Conduct 1.7. Indeed, Yast not only had a common interest with Jamie in the Think Tank Litigation, but an absolute duty to communicate with Jamie about the reasons for his conflict of interest. Ind. R.Prof.Conduct 1.7.

The Rule required Yast to fully disclose to Jamie the nature of his conflict of interest, the reasons for the conflict, and the fact that Yast's professional judgment could be affected by the conflict. The scope of Yast's ethical duty to make this required disclosure is not limited by the nature of the conflict or by the type of conduct that gave rise to the conflict. Accordingly, Yast is not at liberty to circumscribe his disclosure on the possibility that Jamie might consider it defamatory. As a result, the trial court correctly determined that Yast's communication with Jamie was made pursuant to a common interest or duty under this qualified privilege.

Gagan and the other sellers also admit that Yast had a conflict of interest because Yast's personal interest in preserving his investment in DirectBuy conflicted with Gagan's interest in keeping the $17 million in member merchandise money. However, Gagan and the Sellers' contention that Yast's personal conflict did not extend to his representation of ThinkTank simply because Jamie owned it ignores the undisputed evidence, the decision of the Disciplinary Commission, and the very purpose of Rule 1.7.

Yast testified that Gagan was directly involved in the ThinkTank litigation; that Gagan had hired, fired, and rehired him; that Yast reported to Gagan and Deutsch as ThinkTank's representatives; and that Gagan paid his fees for this engagement. The fact that Yast had an actual conflict of interest with representing ThinkTank was confirmed by the Indiana Supreme Court Disciplinary Commission.

The designated evidence shows that Yast truthfully and correctly believed that he had to disclose his conflict to Jamie. Yast then acted upon his belief by making the required disclosure and withdrawing from the litigation. Yast's testimony, his actions, and the decision of the Disciplinary Commission all establish that Yast made his disclosure in good faith as a matter of law.

Notwithstanding the above, Gagan and the sellers point out that a communication protected by a qualified privilege can lose its privileged status if the plaintiff proves that the privilege has been abused. Bals v. Verduzco, 600 N.E.2d 1353, 1356 (Ind. 1992). A privilege is abused when there is proof that (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statement; or (3) the statement was made without belief or grounds for belief in its truth. Id.

In this case, there is absolutely no evidence that Yast's disclosure was primarily motivated by ill will, in that the statement did not go beyond the scope of the purpose of this privilege. Holcomb v. Walter's Dimmick Petroleum, Inc., 858 N.E.2d 103, 106-07 (Ind. 2006). Indeed, the evidence shows that Yast made a private phone call to inform

16

Jamie that Yast had a conflict of interest and had to withdraw. Appellant's App. p. 568-70; 575-80. Yast used this privilege for its intended purpose, namely to inform his client of a matter that affected their common interest, and to make a disclosure that he was ethically required to make. Because Yast's actions did not go beyond the scope of the privileged occasion there can be no showing of ill will or "actual malice." Williams v. Tharp, 914 N.E.2d 756, 764 (Ind. 2009).

Even more compelling, the evidence establishes that Yast's "primary motivation" in speaking to Jamie was to comply with Rule 1.7 by informing Jamie of the conflict of interest and the reasons for the withdrawal from the matters. Moreover, Yast's lack of ill will is clearly established by the host of witnesses who testified that Yast never said anything derogatory about Gagan or the other sellers.

We also cannot say that the letters Yast sent to Gagan amounted to evidence of ill will. The letters only established that Yast and Gagan had a developing conflict that ultimately required Yast to withdraw from his representation. Moreover, the evidence does not support the notion that Yast's statements were made without belief or grounds for belief in their truth. Yast testified unequivocally that he believed he had an obligation to withdraw from the ThinkTank litigation based upon his conflict of interest, and that Rule 1.7 required him to fully disclose the reasons for his withdrawal.

Indeed, Yast held a good faith belief that the Gagan and the sellers improperly withdrew $17 million of member merchandise money from DirectBuy. The sellers admittedly took member merchandise money that had previously been used for other

17

purposes, and they admitted that DirectBuy had terminated franchisees on occasion that took member merchandise money because the sellers considered it to be theft. In short, Yast knew that Gagan and the others sellers' withdrawal of members' merchandise money violated a fundamental "bedrock" principle of DirectBuy, that the other officers believed it was improper, and that Trivest contended it was unauthorized under the merger agreement.

Finally, we note that Gagan and the other sellers have set forth no designated evidence demonstrating that they have suffered any reputational harm or actual damage from Yast's statements to Jamie during the telephone call. In sum, there is no evidence that Yast abused his qualified common interest privilege, and we conclude that the trial court properly granted Yast's motion for summary judgment on this basis.

The judgment of the trial court is affirmed.[2]

KIRSCH, J., and BROWN, J., concur.

---

[2] Because we have determined that the trial court properly entered summary judgment for Yast on this basis, we need not consider whether the trial court should also have granted Yast's motion on the grounds of absolute privilege.

18